## Sugarline Associates v. Alpen Associates

[586 A.2d 1115]

No. 87-432

Present: Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.

Opinion Filed December 7, 1990

*David Putter* of *Saxer, Anderson, Wolinsky & Sunshine,* Montpelier, for Plaintiff-Appellant.

*James M. Vitt* of *Paterson & Walke, P.C.,* Montpelier, for Defendant-Appellee.

**Peck, J.** This case involves the 1985 purchase by plaintiff Sugarline Associates, a limited partnership, of a hotel and land in Waitsfield, Vermont, owned by defendant Alpen Associates, also a limited partnership. Sugarline sued for damages, claiming that Alpen fraudulently failed to disclose information about the site's septic system, and Alpen counterclaimed to collect on a promissory note given to Alpen at the closing. The superior court awarded damages on the constructive fraud claim and set off that sum against the amount owed on the note, with a net award to Alpen. Both parties appealed, raising numerous issues. We find as a matter of law that Alpen's conduct in this transaction did not amount to fraud (constructive or otherwise) and accordingly vacate the damages award. We remand for a determination of what amount, if any, Sugarline owes on the promissory note.

## I.

As found by the trial court, the facts essential to the issues on appeal are as follows. Alpen Associates owned and operated a 33-room hotel and restaurant in Waitsfield known as the Alpen Inn. Prior to Alpen's purchase of the property in 1982, the leach field had failed, and the previous owner had applied to the state for a land use permit to install a new leach field. A permit was issued in 1978 approving the construction of a replacement field and containing the following condition:

> Only utilization of the replacement field is authorized. Any substantial change to the project involving increased wastewater flows or further repair or reconstruction of the subsurface wastewater disposal system will require prior review and approval by the Agency of Environmental Conservation.

A new leach field was installed and used thereafter. The permit was among the records transferred to Alpen when it assumed ownership of the inn.

After purchasing the property, Alpen initiated a project to construct condominiums alongside the hotel, and to this end began the necessary Act 250 permit process. In November 1982, a hydrogeologist with the Agency of Environmental Conservation, Stephen Goldberg, visited the site and performed soil tests. In a letter to Michael Wurth, a geologist hired by Alpen, Goldberg related details of his findings and recommended further analysis. The letter referred to the 1978 land use permit authorizing use of the replacement field only, and stated that "[t]he new disposal field has a design capacity of 4,500 gallons per day and the old field had a design capacity of 7,500 gallons per day." Goldberg then concluded his letter:

> Since the proposed condominium development is an expansion of the overall Alpen Inn property operation, a replacement disposal área for the Inn facility must be identified and provided before consideration can be given to the condominium project. The Food and Lodging Section of the Vermont Department of Health has indicated that the Inn is licensed for 130 bed spaces and 150 restaurant seats. This means that a replacement area with a capacity to accommodate 11,000 gallons per day of sewage must be provided. It should be pointed out that the new disposal field for the Inn facility and the old disposal field (if utilized) have a combined design capacity of just over 11,000 gallons per day.

Alpen received a copy of this letter. Alpen's failure to disclose the letter and the 1978 permit (or the information contained therein) in the subsequent negotiations with Sugarline is the basis for the fraud claim.

A week after the letter was sent, Goldberg and Wurth met to discuss plans for increased sewage capacity for the condominium project. A second letter from Goldberg to Wurth, also with a copy to Alpen, dated the day after the meeting, summarizes their agreements on what further tests should be performed. This letter contains the following paragraph: "It is our understanding that the land encompassing the Alpen Inn will be subdivided into a 10 acre parcel. Therefore, the subject of the replacement leach field as raised in our letter of November 22, 1982 is no longer under our jurisdiction."

The land apparently could accommodate a septic field for the condominium development. In May of 1983, Wurth wrote to a geologist at the Department of Water Resources, confirming a meeting at which it was decided that "the project will have 92 bedrooms generating 13,800 gallons of waste water per day. A 10% flow reduction will be generated for the installation of low flow mixture. The septic tank will be sized for 13,800 gallons per day, while the disposal field sizes and flow nets will be based upon the reduced flows of 12,420 gallons per day."

Alpen subsequently abandoned the condominium project, and placed the inn on the market. In the fall of 1984, Andrew Neisner, a general partner of Sugarline Associates, began negotiations with Alpen's general partners, Robert Forenza and Geoffrey Dickes, to purchase the property. The trial court found that Neisner informed Forenza and Dickes "of his intention, upon purchase of the property, to enlarge the hotel." Finding No. 34 states in part:

> The plans were described in general terms, and the defendants were told that Mr. Neisner planned to build a luxury "Sheraton Spec" hotel that would have approximately 100 rooms which would sleep 4 persons each. It would also have a restaurant, lounge, health center and conference facilities which could service 250 people. The credible evidence is that the defendants did not tell Mr. Wolf [Neisner's associate] or Mr. Neisner during 1984 that there was 11,000 gallons per day available sewage capacity from the existing systems or that the old leach field and the new leach field could be used together. However, Mr. Neisner was told by Mr. Dickes that defendant had verbal concurrences from the State of Vermont for 13,800 gallons in back of the Inn with a flow reduction of 12,420 gallons per day.

In short, no affirmative misrepresentations were made.

Discussions continued for several months and in May of 1985, Neisner delivered a draft purchase and sales agreement to Alpen's attorney. Section 12 of the draft agreement included the following representations by the seller:

> (a) That the present septic system is in good working order and approved for a capacity of _____ gallons. There are no known defects therein.

(b) That Seller has obtained approval for construction of an additional 13,500 gallon capacity septic system pending completion of final design drawings suspended prior to submission. The obtaining of said final approval shall be a contingency upon this agreement.

Alpen expressly refused to enter a figure into the blank in section 12(a). After further discussion, Neisner prepared a second draft agreement with a new section 12(a) as follows:

That the existing septic system is in good working order and is *currently approved for the capacity required by the Alpen Inn.* There are no known defects therein. Seller warrants that there have been no recent problems with capacity or flow which would jeopardize continued use of the system at its present capacity.

(Emphasis added.) Alpen stated that it could not agree to this provision either.

Negotiations continued. Finding No. 50 relates a discussion at a June 1, 1985 meeting:

Mr. Lorenz (Neisner's attorney) told the defendants that the plaintiff needed between 22,000 and 24,000 gallons per day from a septic system. Mr. Lorenz stated that he asked the defendants whether he could place 9,000 gallons per day, 10,000 gallons per day or 11,000 gallons per day as an amount of the existing septic system. Attorney Lorenz stated that he understood from the discussion that the existing system would have no less than 9,000 gallons per day. The credible evidence is that the defendants told Mr. Lorenz and Mr. Neisner that they did not know what the legal capacity of the existing system was.

The trial court found, however, that Dickes and Forenza did not disclose all that they did know. Finding No. 54 states:

The court finds that during negotiations with Neisner, Forenza and Dickes knew, but did not disclose to Neisner or any other representative of the plaintiff:

(a) That the Alpen Inn had and was only authorized to use one leach field.

(b) That leach field had a design capacity of only 4,500 gallons per day.

(c) That there was no back-up leach field with which that 4,500 gallons per day leach field could be alternated.

(d) That the second "old" leach field had failed in 1978.

The record also tends to show (although the trial court did not make findings on the matter) that, during these negotiations, Dickes and Forenza offered to convey additional information but that Neisner declined the offer. Neisner acknowledged in testimony that it is his general practice to hire engineers to handle the technical aspects of his projects. Forenza testified that during a discussion on an early draft of the purchase and sales agreement, when Sugarline "was trying to have us get this gallonage put in the contract . . . I mentioned that there was some representation, that there was something in the files that may determine it. . . . Mr. Neisner came in and he indicated that his engineers would be checking it out, and to leave it at that, and that was the understanding we had." This exchange was confirmed in testimony by Alpen's real estate broker, Brian Lewis, who was present at the meeting. Dickes also testified generally that "whenever I endeavored to volunteer something, I always felt that it was received somewhat negatively as though . . . I couldn't hope to know as much about the development process as what Mr. Neisner knew."

Neisner did not request access to Alpen's files on the inn until June 18, 1985, the date the sales contract ultimately was signed. On the following day, Dickes accordingly provided the records to Neisner's contractor, Robert Blair, including the 1978 land use permit and the letters from Stephen Goldberg. Blair acknowledged that Dickes was "always willing to provide" him with information. There is no evidence that files were ever withheld from Neisner or his agents. The record also reveals that the 1978 permit and the Goldberg letters were on file at the District 5 Environmental Commission office and were thus available to Neisner even had Forenza and Dickes refused to provide them.

The signed purchase and sales agreement provides in section 12(a):

> That the existing septic system is in good working order with no known defects. Seller warrants that there have been no recent problems with capacity or flow thereof which would jeopardize continued use of the system at its present capacity.

Section 12(b) in the agreement appears substantially as it did in Neisner's first draft. Section 12(c) states that "excepting cer-

tain fire code violations, there are no known violations of any state, local or federal laws or regulations and Seller has no knowledge of any condition now existing which would cause such a violation." No reference is made to the amount of present capacity or whether the existing system had been approved for the capacity required by the inn, items from the earlier drafts that Alpen had expressly refused to warrant.

The contract also specifies that the buyer shall be responsible for obtaining all permits "for the construction of a not less than 90 unit condominium hotel." Appended to the agreement is a list of the required permits including a "certificate of compliance" from the Department of Water Resources, with the proviso:

> It is understood that the Seller makes no representation that any permit or authorization it has obtained will be valid, or subject to amendment so as to be suitable, for Buyer's intended development project.

Hoping to complete construction by the end of the year, Neisner immediately began preparations for obtaining the requisite permits. New soil tests were done, and an engineering firm was engaged to design a new septic system. The Department of Water Resources finally issued a "certificate of compliance" on November 22, 1985, approving wastewater disposal of 4,500 gallons per day in the field previously approved in 1978 and 15,421 gallons per day in the newly designed field. A land use permit was issued on December 6, 1985 by the District 5 Environmental Commission, authorizing extensive renovation of the inn.

The sale was closed on December 13 and 16, 1985. Among the terms of payment, Sugarline executed a promissory note, secured by the property, in the amount of $309,500. Interest at 15 percent was to be paid monthly over the course of a year, and the principal was to be paid in full on December 16, 1986. Sugarline fell behind on the interest payments and never paid the principal.

The trial court concluded that Alpen was liable for "constructive fraud" because it failed to disclose material facts, thereby inducing Sugarline to purchase the property. The court accordingly awarded Sugarline damages, calculated at $36,528. This

amount was set off from the larger amount of $333,508 due Alpen on the promissory note.

## II.

■■ Liability for fraud may be premised on the failure to disclose material facts as well as on affirmative misrepresentations.

> Under Vermont law, fraud must "consist of some affirmative act, or of concealment of facts by one with knowledge and a duty to disclose." *Standard Packaging Corp.* v. *Julian Goodrich Architects, Inc.*, 136 Vt. 376, 381, 392 A.2d 402, 404 (1978). . . .
>
> . . . Where such duty is present, the failure to disclose a material fact coupled with an intention to mislead or defraud rises to the level of material misrepresentation.

*White v. Pepin*, 151 Vt. 413, 416, 561 A.2d 94, 96 (1989); accord *Sutfin v. Southworth*, 149 Vt. 67, 70, 539 A.2d 986, 988 (1987) ("Vermont has long recognized the doctrine of negative deceit" where there is a duty to speak); *Cushman v. Kirby*, 148 Vt. 571, 575–76, 536 A.2d 550, 552–53 (1987); *Cheever v. Albro*, 138 Vt. 566, 571, 421 A.2d 1287, 1290 (1980). Where there is no intent to mislead or defraud, but the other elements of fraud are met, we have held that a seller may be liable for constructive fraud. "'Actual fraud' is deceitful misrepresentation or concealment with evil intent, while 'constructive fraud' is wrongdoing without bad faith." *Proctor Trust Co. v. Upper Valley Press, Inc.*, 137 Vt. 346, 354, 405 A.2d 1221, 1226 (1979). Here, the trial court made no findings that Alpen *intended* to defraud or mislead Neisner—only that, by withholding critical information, it did in fact mislead him. The findings therefore do not support liability for actual fraud, and the trial court properly rejected that claim. We hold that the court erred, however, in concluding that Alpen was liable for constructive fraud.

■ We may assume that Alpen had a duty to disclose once Neisner inquired as to the capacity of the septic system. Cf. *White v. Pepin*, 151 Vt. at 416, 561 A.2d at 96 ("no general duty to disclose facts absent inquiry"). We also assume, as the trial court found, that Alpen knew the facts and that they were "material" to the transaction, although there is some evidence in

the record to the contrary. Materiality, knowledge, a duty to disclose, and a failure to do so, however, do not exhaust the elements of constructive fraud. As with any action in fraud, recovery also requires that the party claiming fraud *justifiably relied* on the statements or conduct of the other. Liability in fraud extends only to harm caused by the buyer's "'justifiable reliance upon the misrepresentation.'" *Proctor Trust Co. v. Upper Valley Press, Inc.*, 137 Vt. at 351, 405 A.2d at 1224–25 (quoting Restatement of Torts § 525 (1938)); accord Restatement (Second) of Torts §§ 525, 537 (1977).* It is the element of justifiable reliance that is missing in this case.

Neisner relied only on inferences he himself drew from the information conveyed to him—none of it false—coupled with Alpen's express disclaimers of knowledge as to the septic capacity then existing and its express refusal to warrant that the system was approved for the capacity required by the state for an inn of that size. These were signals that would lead a reasonable buyer *not* to rely on an assumption that all relevant documents or information had been disclosed, but, to the contrary, to investigate further. As we stated recently: "The 'duty' to investigate, such as it is, is not necessarily determined by the experience of the parties to a deal, but by their conduct and the circumstances under which they make their decisions." *White v. Pepin*, 151 Vt. at 420, 561 A.2d at 98. The conduct and circumstances here—strikingly different from those where we have allowed recovery—indicate that Neisner was not justified in relying on his inferences and assumptions about the property's septic system.

In *White v. Pepin*, the defendant had purchased a business and failed to pay certain consulting fees due the plaintiff under

---

* Section 525 states the basic rule of liability for fraudulent misrepresentation, in part: "One who fraudulently makes a misrepresentation . . . is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation." Section 537 provides: "The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if, (a) he relies on the misrepresentation in acting or refraining from action, and (b) his reliance is justifiable." Identical rules apply where one party conceals or intentionally prevents the other from acquiring material information, § 550, or where a party under a duty to disclose "fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting." § 551(1).

the sale agreement. When the plaintiff sued for the fees, the defendant counterclaimed that he was induced to buy the business through fraud. The trial court dismissed the counterclaim and ruled that the defendant had a burden to investigate the truthfulness of the plaintiff's representations, "stating that most of the facts of which defendant complained were readily discoverable through review of the Chapter 11 bankruptcy pleadings or other investigative techniques prior to the purchase." *Id.* at 419–20, 561 A.2d at 98. We reversed, holding that

> what constitutes due diligence must be weighed against the facts of each case. Here, plaintiff placed defendant in a position where it was impossible, if he wanted to make a deal, to do any investigation other than what he did . . . .
>
> . . . Where, as here, plaintiff placed defendant in a position calculated to discourage independent investigation, and where defendant actively sought out information from plaintiff himself as well as from corporate books and records, it would be inequitable now to require that defendant should have inquired further.

*Id.* at 420, 561 A.2d at 98. In the present case, by contrast, Alpen never discouraged independent investigation and certainly did not make further investigation by Sugarline "impossible"; the evidence shows, to the contrary, that Alpen *invited* further investigation, at least by implication. Sugarline was under time constraints of its own making, unlike in *Pepin*, where the buyer "was told, in effect, that if he did not make a purchase offer almost immediately, [the seller] would be compelled to accept [another] offer." *Id.* at 415, 561 A.2d at 95. The equities, in short, are entirely dissimilar in the two cases.

Our decision in *Cushman v. Kirby* is similarly instructive. In that case, a couple selling their house failed to disclose to the buyers that the well water was sulfuric and only "tolerable" to drink after treatment, responding to the buyers' inquiry about the water's quality only that the water was "a little hard." 148 Vt. at 573–74, 536 A.2d at 551. We held that the question of fraud was properly submitted to the jury under the following standard:

> "Where one has full information and represents that he has, if he discloses a part of his information only, and by

words or conduct leads the one with whom he contracts to believe that he has made a full disclosure and does this with intent to deceive and overreach and to prevent investigation, he is guilty of fraud against which equity will relieve, if his words and conduct in consequence of reliance upon them bring about the result which he desires."

*Id.* at 574, 536 A.2d at 552 (quoting *Crompton v. Beedle*, 83 Vt. 287, 298, 75 A. 331, 334–35 (1910)). Again, in marked contrast, Alpen never represented or implied that it had "full information" and never indicated by its words or conduct that it had "made a full disclosure." Alpen's words and conduct conveyed exactly the opposite impression.

In *Sutfin v. Southworth*, we reversed a judgment for the seller of a home after the buyer sued in fraud, where the seller failed to disclose facts pertaining to the septic system. There, we held that "when the nature of the misrepresentation or fraudulent concealment itself led the plaintiff to forebear a full inquiry, such reliance will not bar recovery." 149 Vt. at 70, 539 A.2d at 988. Here, as we have emphasized, the nature of the "concealment" found by the trial court, far from having led Sugarline "to forebear a full inquiry," actually invited further inquiry.

■■ Whether or not a buyer has a general duty to investigate facts material to its purchase of real estate, see W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on The Law of Torts § 108, at 752 (5th ed. 1984), we conclude that a duty to investigate is triggered when, as here, the buyer is put on notice by the seller's declaration of ignorance of the material facts. Dickes' and Forenza's statements disclaiming knowledge and their express refusal to identify an existing septic capacity—even if they had deliberately withheld information—would put a reasonable buyer, planning a multimillion dollar development, on notice that it should investigate further, until satisfied it has the information it needs, or proceed at its own risk. Sugarline relied not on false information obtained from Alpen, nor even on Alpen's silence as to material facts, but on inferences it drew from discussions with Alpen regarding the property's septic capacity that Alpen expressly refused to warrant. In these circumstances, the buyer's reliance was not justified and cannot be the predicate of liability for fraud, constructive or actual.

## III.

Sugarline argues that Alpen's counterclaim upon the note is moot because Alpen subsequently "obtained satisfaction of a judgment in foreclosure against the realty secured by that note" and should not be permitted a double recovery. Alpen responds by denying that it is in possession of the property. We remand to the superior court for a determination of the facts necessary to decide whether Alpen has indeed obtained full satisfaction.

The parties also raise claims pertaining to the proper remedy for constructive fraud (Alpen contends that rescission is the only available remedy); the amount of damages (Sugarline contends it should be awarded additional damages representing the "benefit of the bargain" plus consequential damages caused by delay); the court's failure to award prejudgment interest on the damages award; and the timeliness of Neisner's assignment of his cause of action to Sugarline. None of these claims need be addressed in light of our holding that the elements of fraud were not proved.

*Judgment reversed; cause remanded for proceedings as directed herein.*