**Edward B. VON TURKOVICH and Francis J. Von Turkovich, Individually and as Vermont partnerships Richmond Group Partnership and 125 Bank Street Partnership, Plaintiffs,**

v.

**APC CAPITAL PARTNERS, LLC, APC Properties Corporation, Jamil Simon, and Amy Klein, Defendants.**

No. 2:00–CV–458.

United States District Court,
D. Vermont.

April 21, 2003.

Carl H Lisman, Christina A. Jensen, Lisman, Webster, Kirkpatrick & Leckerling, P.C., Burlington, VT, for Plaintiffs.

Robert S DiPalma, Paul, Frank & Collins, P.C., Burlington, VT, for Defendants.

*Corrected* \*

## OPINION AND ORDER

SESSIONS, Chief Judge.

Plaintiffs filed this action on December 7, 2000 seeking declaratory relief and dam-

---

\* Two corrections to the Opinion and Order filed on October 31, 2002 and are denoted by asterisks in this corrected version.

ages for breach of lending agreements, breach of the implied covenant of good faith and fair dealing, tortious interference with business relations, fraud in the inducement, promissory estoppel, and defamation.[1] Defendants have moved for summary judgment on all claims. For the reasons described below, the motion for summary judgment (Paper 47) is **GRANTED** in part, as to the request for declaratory relief and the breach of contract, fraud in the inducement, promissory estoppel, and defamation claims, and **DENIED** in part, as to the tortious interference with business relations and breach of the implied covenant of good faith and fair dealing claims.

## I. Background

The following facts are viewed in the light most favorable to the nonmoving party, in this case Plaintiffs. Plaintiffs Edward B. von Turkovich and Francis J. von Turkovich (the "von Turkoviches") are Vermont residents with more than twenty-five years of experience owning and operating real estate investments in Vermont and substantial business experience with Vermont lenders in connection with these investments. Francis von Turkovich is an attorney practicing law in the state of Vermont. Plaintiffs Richmond Group Partnership ("Richmond Group") and 125 Bank Street Partners ("125 Bank Street") are Vermont partnerships with their principal place of business in Vermont. The von Turkoviches are partners in these partnerships. Plaintiffs own commercial real estate in several Vermont counties.

APC Capital Partners, LLC, a Delaware entity, and APC Properties Corporation, a New York entity, (collectively "APC") both have their principal place of business in New York. Jamil Simon ("Simon") is President and Amy Klein ("Klein") is an employee of APC. APC is engaged in the business of purchasing loans, including the defaulted loans at issue in this case.

In June of 2000, Plaintiffs had at least eight outstanding loans (the "Merchants Notes" or "Merchants Loans") totaling $1.107 million, with Merchants Bank. The Merchants Loans were secured by mortgages or security agreements on real property and personal property owned by Plaintiffs in Vermont. As of June 18, 2000, Plaintiffs were delinquent in payment on some of the Merchants Loans.

APC purchased the Merchants Notes on June 28, 2000. During the months before APC purchased the Merchants Notes, Plaintiffs had been negotiating a lease with the United States Veterans Administration (the "VA") for a then-vacant commercial space at one of the properties securing the notes, 74 Hegeman Avenue ("74 Hegeman") in Colchester, Vermont. This lease was signed on June 29, 2000. Under the lease, Plaintiffs agreed to substantially complete fit-up work of the space by September 15, 2000. Plaintiffs entered into a construction contract with Yandow/Dousevicz ("Y/D") for the fit-up work.

On June 29, 2000, APC sent eight letters to Plaintiffs indicating that APC had purchased each of the eight loans. The letters specific to the loans in default stated that the balances were immediately due and payable in full. In all of the letters, APC requested that Plaintiffs deliver, by July 10, 2000, copies of the insurance policies taken out on the real properties securing the loans.

---

1. In their complaint Plaintiffs also claimed that Defendants had failed to obtain a license to engage in the business of making loans in violation of Vt. Stat. Ann. tit. 8, § 2200. The Court has already granted Defendants summary judgment on this count. *Von Turkovich v. APC Capital Partners, LLC*, No. 2:00–CV–458 (D.Vt. Aug. 14, 2001) (oral order).

On July 28, 2000, APC entered into a written agreement (the "Forbearance Agreement") with the von Turkoviches and 125 Bank Street. Under this agreement, Plaintiffs admitted that they were in default on one or more of the Merchants Loans. APC agreed not to exercise any of its default remedies under the Merchants Loans until August 15, 2000, to permit a limited moratorium on principal and interest payments on the Merchants Loans until August 31, 2000, and to withdraw its objections[2] to the VA project at 74 Hegeman. This forbearance and withdrawal was explicitly conditioned on Plaintiffs' promise to, among other things, permit no notices of mechanic's liens to be filed against the property, promptly pay all amounts due for the work following submission of payment invoices, and provide APC "evidence satisfactory to [APC] of [Plaintiffs'] having arranged financing to fund [the VA] construction by August 15, 2000." Forbearance Agreement ¶ 1.3.

According to Plaintiffs, at some time prior to August 4, 2000, the parties also entered into an unwritten agreement (the "Oral Agreement") "under which APC would loan additional funds to Plaintiffs, withdraw their objections to the VA project, and modify certain obligations of Plaintiffs, including specifically extending the maturity date until April 7, 2001, to permit Plaintiffs time to obtain alternative permanent financing." Pls.' Opp'n to Mot. for Summ. J. at 2 (citing V. Compl. ¶ 24). Plaintiffs claim that the Oral Agreement was "memorialized in" or "effected by" a set of documents executed on August 4, 2000 (the "August 4 Documents"). These documents include a Business Loan Agreement (the "Business Loan Agreement"), a Rider to Loan Consolidation, Modification and Security Agreement (the "Rider"), and a Commercial Promissory Note (the "August 4 Note").

The August 4 Documents consolidated the eight Merchants Loans and certain expenses, fees, and interest, and obligated Plaintiffs to pay APC the principal amount of $1,149,101, plus interest, on or before April 7, 2001. The August 4 Note permits APC to elect to accelerate this loan if Plaintiffs breach "any condition in any instrument delivered in connection with" the Note. Among other things, the Rider specifies conditions Plaintiffs must meet in exchange for extension of the Forbearance Agreement's moratorium on principal and interest payments until April 7, 2001. The Business Loan Agreement also sets forth a series of definitions and conditions that "shall" apply to the consolidation.

On August 16, 2000, Simon contacted Francis von Turkovich to determine whether financing was in place to fund the construction at 74 Hegeman, noting that "VA construction approval was conditioned on" such financing. Defs.' Mot. for Summ. J., Ex. 15. On August 17, Francis von Turkovich told Simon that although he had a loan commitment from Citizens Bank, it was insufficient to meet the construction costs and security conditions of the commitment. On August 18, in part because it had not received what it considered adequate assurances that construction financing was available, APC sent a notice of default (the "August 18 Notice of Default") to Plaintiffs. Additional defaults related to 74 Hegeman and other properties secur-

---

**2.** The parties dispute whether Plaintiffs' signing of the lease with the VA and commencement of the fit-up work satisfied certain lender consent provisions of the mortgage on the 74 Hegeman. Similarly, they dispute the appropriateness of Plaintiffs' sale of certain gym equipment at 74 Hegeman. However, Defendants' summary judgment motion is premised on unrelated defaults that occurred after the August 4 Documents were signed, not these other prior alleged defaults.

ing the August 4 Note were also specified in the August 18 Notice of Default,** including failure to timely pay real estate taxes, provide evidence of insurance, and maintain the properties in good condition and repair, and maintaining a Charter One Bank mortgage on the property superior to APC's mortgage.

On August 20, Plaintiffs forwarded copies of two letters from banks proposing loans to finance the construction. The first was the Citizens Bank commitment mentioned above, and the second was a commitment from Chittenden Bank. Between August 23 and 31, APC proposed several construction financing alternatives but Plaintiffs did not accept these proposals. Instead, Plaintiffs maintained throughout the end of the month and into September that closing on the construction financing was imminent. However, although they pursued additional means of paying for the construction project throughout the fall, the financing was not obtained until December 29, 2000.

On August 25, Y/D filed a notice of mechanic's lien on 74 Hegeman in the Colchester land records. The notice stated that $400,000 in labor and materials supplied for the fit-up work had come due within 30 days of the filing and that Y/D had not been paid any portion of that amount.[3] The mechanic's lien was filed following a call from Simon to Jim Dousevicz ("Dousevicz") of Y/D a few days prior to the 25th. During this call Simon advised Dousevicz that he would be willing to arrange for payment of the unpaid work, but only if a mechanic's lien was filed.

On September 1, 2000, APC filed a complaint in Chittenden County Superior Court for foreclosure (the "Foreclosure

Complaint") of its 74 Hegeman mortgage. The Foreclosure Complaint alleged the same defaults as the August 18 Notice of Default. Between September 1 and September 12, after serving Plaintiffs, APC sent copies of the Foreclosure Complaint to the tenants of 74 Hegeman. Around October 4, after Plaintiffs sought to remove the Foreclosure Complaint to federal court, APC dismissed the claim. After the dismissal, APC wrote to Plaintiffs' tenants requesting that their rents be paid directly to it.

On September 18, APC sent a second notice of default (the "September 18 Notice of Default") to Plaintiffs. This notice listed defaults similar to the first, including Plaintiffs' failure to provide assurances of sufficient funds to pay contractors and the filing of the mechanic's lien. It also listed Plaintiffs' failure to pay the origination fee for the consolidated loan by September 15, as required under the Rider. On October 6, APC notified Plaintiffs in writing that it intended to foreclose on all nine of the mortgages it held on Plaintiffs' properties, including the 74 Hegeman mortgage (the "October 6 Notice of Intent to Foreclose").

APC's threatened foreclosure never occurred. Plaintiffs finally succeeded in refinancing the August 4 Note on December 29, 2000 using financing from Citizens Bank and Merchants Bank. This financing was also used to settle Y/D's claim for the VA project fit-up work.

## II. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."

---

** This clause has been corrected to read the "August 18 Notice of Default," instead of the "September 18 Notice of Default."

3. A second notice of mechanic's lien was filed by Y/D on December 8, 2000, increasing the total claimed to $474,223, due not earlier than October 10, 2000.

Fed.R.Civ.P. 56(c). A fact is material when it affects the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue as to a material fact exists when the evidence requires a factfinder to resolve the parties' differing versions of the truth at trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

The moving party has the initial burden of coming forward with those parts of the record it feels demonstrate an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). When evaluating a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. The court may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party. *Id.* at 247–52, 106 S.Ct. 2505.

## III. Discussion

Plaintiffs' claims are based in large part on the contention that APC breached the Oral Agreement and August 4 Documents when it sent the default and foreclosure notices and then exercised default remedies. Plaintiffs argue that APC was not entitled to claim default or to pursue these remedies because none of the claimed defaults constituted a material default under the agreements between the parties and, in the case of the filing of the mechanic's lien, because APC induced Y/D to file the mechanic's lien. Plaintiffs also claim that

they were fraudulently induced to execute the August 4 Documents and that APC was barred by promissory estoppel from enforcing the agreements against them for the defaults. Finally, Plaintiffs claim that APC's conduct surrounding the filing of the mechanic's lien and its exercise of default remedies violated the covenant of good faith and fair dealing and constituted tortious interference with its business relations.

The Court disagrees. At the time the first letter of default was sent in August 2000 and throughout the fall of 2000, Plaintiffs were in default on the Forbearance Agreement, the August 4 Documents, and the. mortgages securing the August 4 Documents. Moreover, Plaintiffs have failed to put forth sufficient evidence to support the claim that they were fraudulently induced to execute the August 4 Documents or that promissory estoppel is applicable to this case. They have, however, come forth with sufficient facts to survive summary judgment on their implied covenant of good faith and fair dealing and tortious interference with business relations claims, based on APC's conduct with regard to one of their tenants.

## A. The Effect of the Oral Agreement

Plaintiffs first claim that the alleged defaults are not defaults under the agreements with APC because of the Oral Agreement allegedly reached by the parties sometime prior to August 4, 2000. According to Plaintiffs, APC agreed to "loan additional funds to Plaintiffs, withdraw their objections to the VA project, and modify certain obligations of Plaintiffs, including specifically extending the maturity date until April 7, 2001,*** to permit Plaintiffs time to obtain alternative permanent financing." Plaintiffs also allege that

*** This clause has been corrected to read "April 7, 2001," instead of "April 7, 2000."

under the Oral Agreement, APC promised that it would not "strictly enforce" the terms of the agreement until Spring 2001. Plaintiffs appear to argue that any enforcement of the default provisions of the August 4 Documents by APC violated the Oral Agreement to forbear from "strict enforcement."

The problem with this argument is that even if, as Plaintiffs contend, the August 4 Documents were intended to memorialize the Oral Agreement, nothing in any of the August 4 Documents suggests that APC agreed not to exercise its rights and remedies for any future defaults until the Spring of 2001. In fact, the Rider specifically states that APC was only willing to forbear from exercising its rights under the Merchants Loans subject to the terms and conditions of the August 4 Documents. Rider ¶ G. Moreover, Francis von Turkovich himself admits that he did not understand that APC was giving up the right to exercise such remedies by signing the August 4 Documents. Francis von Turkovich Dep. at 19.

Nor is there any reference to the Oral Agreement in the August 4 Documents. To the contrary, the Rider includes a merger clause providing that "[t]his Agreement and the other Loan Documents constitute the entire agreement of the parties as to the matters set forth herein, including without limitation, the Merchants Loans." Rider ¶ 13(e). Such a merger clause "confirms that the contract is adopted by the parties as a *complete and exclusive* statement of the terms of the agreement" and bars enforcement of any prior oral agreement. *Hoeker v. Dept. of Soc. & Rehabilitation Servs.,* 171 Vt. 620, 621, 765 A.2d 495, 499 (2000) (quotations omitted) (emphasis in original).[4]

Finally, even without the merger clause, the parol evidence rule would bar enforcement of the Oral Agreement because it is a prior oral agreement that varies or contradicts the terms of the written agreement. *Id.,* 171 Vt. at 622, 765 A.2d at 499; *see also Hous. Vermont v. Goldsmith & Morris,* 165 Vt. 428, 431, 685 A.2d 1086, 1088 (1996). Thus, Plaintiffs cannot rely on the alleged Oral Agreement to modify the terms of the August 4 Documents.

The parol evidence rule also bars Plaintiffs' attempt to enforce the Oral Agreement under the theory of promissory estoppel. *See Big G Corp. v. Henry,* 148 Vt. 589, 594, 536 A.2d 559, 562 (1987) (where a prior oral agreement is not separate and distinct from the subsequent written contract, the parol evidence rule bars enforcement of the oral agreement under a theory of promissory estoppel). Moreover, the doctrine of promissory estoppel is inapplicable because the parties reached a binding contract governing their respective obligations. Promissory estoppel applies only when necessary "to prevent injustice and unconscionable advantage where an exchange of promises did not create a binding contract." *Id.* (quotations omitted).

In sum, Plaintiffs cannot use the terms of the Oral Agreement to modify the obligations of the parties under the August 4 Documents. The terms of the August 4 Documents control.

## B. Fraud in the Inducement

Plaintiffs argue, however, that the parol evidence rule and the terms of the August 4 Documents should not control in this case because Plaintiffs were fraudulently induced to execute the August 4 Docu-

---

4. Because the Court has diversity jurisdiction over this matter, 28 U.S.C. § 1332(a)(1), it must follow the substantive state law of Vermont, *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

ments. They claim this inducement was caused by APC's misrepresentations "that the arrangement contemplated [within the August 4 Documents] would accomplish Plaintiffs' goals ... and that they would forebear on strict enforcement of the [August 4] Documents until Spring, 2001." V. Compl. ¶ 93. It is true that the parol evidence rule does not bar introduction of extrinsic evidence to prove fraud in the inducement. *Big G Corp.*, 148 Vt. at 594, 536 A.2d at 562. However, assuming that Plaintiffs' allegations regarding the Oral Agreement and APC's representations are true, they do not constitute fraud in the inducement.

■ Fraud in the inducement is "an intentional misrepresentation of fact affecting the essences of the transaction, false when made and known to be false by the maker, not open to the defrauded party's knowledge, and relied upon by the defrauded party to its damage." *Ben & Jerry's Homemade, Inc., v. La Soul, Inc.*, 983 F.Supp. 504, 506 (D.Vt.1997) (citing *Union Bank v. Jones*, 138 Vt. 115, 121, 411 A.2d 1338, 1342 (1980)). The person who relies on the misrepresentation must have done so "justifiably." *Sugarline Assocs. v. Alpen Assocs.*, 155 Vt. 437, 445, 586 A.2d 1115, 1120 (1990). Plaintiffs have not met their burden of showing that the Oral Agreement embodied any knowing misrepresentations nor that they justifiably relied on the alleged misrepresentations.

■ As to the issue of strict enforcement of the August 4 Documents, Francis von Turkovich admits in his deposition that APC did not agree in the Oral Agreement to limit its exercise of default remedies. If Francis von Turkovich understood that APC would be permitted to exercise the default remedies of the then-contemplated August 4 Documents, Plaintiffs cannot also contend that the alleged agreement against "strict enforcement" constituted a

misrepresentation in light of Plaintiffs' subsequent defaults.

Similarly, Plaintiffs cannot contend that they justifiably relied on any such statement. "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case." *Vermont Plastics, Inc. v. Brine, Inc.*, 79 F.3d 272, 277–78 (2d Cir. 1996) (interpreting Vermont law). The von Turkoviches are sophisticated business people with decades of experience in the commercial real estate business and commercial lending. Francis von Turkovich, who conducted the negotiations and signed the documents, is an attorney. The August 4 Documents and the Forbearance Agreement clearly state that APC's forbearance from enforcing its rights for the existing defaults was contingent on Plaintiffs abiding by certain conditions. These agreements provide no indication that APC was agreeing not to pursue default remedies if such conditions were not met, and Francis von Turkovich apparently understood that the alleged Oral Agreement did not limit the use of such default remedies. No reasonable juror could conclude that Plaintiffs justifiably relied on an alleged misrepresentation that the default remedies would not be enforced until April 7, 2001, in the face of fresh defaults. *Cf. Ben & Jerry's*, 983 F.Supp. at 506 (summary judgment not appropriate where plaintiff inquired about the contradictory written agreement and was told to ignore the language suggesting the agreement constituted a loan and not a grant).

■ The second alleged misrepresentation of fact, APC's statement that the August 4 Documents would accomplish Plaintiffs' goals, is not a statement of existing fact but an opinion offered by APC of the future value of the agreement to Plaintiffs. Normally, "mere expressions of opinion cannot be the basis for an action of fraud."

*Proctor Trust Co. v. Upper Valley Press, Inc.,* 137 Vt. 346, 350, 405 A.2d 1221, 1224 (1979); *accord Howard Opera House Assocs. v. Urban Outfitters, Inc.,* 166 F.Supp.2d 917, 926 (D.Vt.2001). Whether a statement is one of fact or opinion is usually resolved by a jury, however, where the statement is clearly an expression of opinion it "can be disposed of by the court without the aid of the jury." *Batchelder v. Birchard Motors, Inc.,* 120 Vt. 429, 433–34, 144 A.2d 298, 301 (1958); *accord Howard Opera House,* 166 F.Supp.2d at 926. In doing so, the Court must consider "[t]he character and relation of the parties, their respective intelligence, the subject-matter of the bargain, and all the circumstances." *Batchelder,* 120 Vt. at 434, 144 A.2d at 301. In this case, both parties were sophisticated business people and their relationship was adversarial. The future defaults by Plaintiffs were in no way a certainty at the time the statement was made. *See Capital Impact Corp. v. Munro,* 162 Vt. 6, 9, 642 A.2d 1175, 1176 (1992). In light of the adversarial position of the parties, their comparable sophistication, and the nature of the statement allegedly made, no rational juror could find that APC's statement was an intentional misrepresentation of fact.

However, where an opinion is part of a scheme to defraud, it can be actionable as a fraudulent misrepresentation. *Winey v. William E. Dailey, Inc.,* 161 Vt. 129, 133, 636 A.2d 744, 747 (1993); *Proctor Trust Co.,* 137 Vt. at 350–51, 405 A.2d at 1224. Plaintiffs suggest that actions taken by APC subsequent to signing the August 4 Documents demonstrate APC's intent at the time of signing to undermine Plaintiffs' goals under the August 4 Documents. In their Complaint, Plaintiffs point to the filing of "unfounded" default notices and the foreclosure complaint, the notification of Plaintiffs' tenants of such filings, the failure to discharge the notices of foreclosure from the land records, and the inducement to file the mechanic's lien.

However, these actions cannot be said to constitute a fraudulent scheme. As discussed below, the default notices and foreclosure complaint were not "unfounded" and APC was permitted to file them and to communicate them to tenants under the August 4 Documents. Moreover, as discussed below, APC did not improperly induce Y/D to file the mechanic's lien, but only advised Y/D that it would act as a "surety" for the work if such a lien was filed and if necessary to prevent stoppage of the VA project. As for the failure to discharge notices of foreclosure from the land records, Plaintiffs have provided no explanation of how such an oversight, alone, creates a fraudulent scheme.

Finally, even if the opinion had constituted a knowing misrepresentation by APC, Plaintiffs have not met their burden of demonstrating justifiable reliance on this opinion. The recipient of a fraudulent misrepresentation of opinion is

> not justified in relying upon it in a transaction with the maker, unless the fact to which the opinion relates is material, and the maker (a) purports to have special knowledge of the matter that the recipient does not have, or (b) stands in a fiduciary or other similar relation of trust and confidence to the recipient, or (c) has successfully endeavored to secure the confidence of the recipient, or (d) has some other special reason to expect that the recipient will rely on his opinion.

*Howard Opera House,* 166 F.Supp.2d at 927 (quoting Restatement (Second) of Torts § 542). Plaintiffs have not even alleged that any of these special circumstances apply to the transaction with APC. Again, given Plaintiffs' business and financial sophistication, no rational trier of fact

could conclude that they justifiably relied on an opinion from another business person, with whom they were in an adversarial relationship, that the transaction would accomplish their goals.

## C. Claims Based on Lack of Default by Plaintiffs

Having determined that the terms of the August 4 Documents control the financial transaction between the parties, the Court now turns to the question of whether Plaintiffs had in fact defaulted on this agreement. This question must be answered in the affirmative. There is no dispute of material fact as to whether Plaintiffs, in violation of the agreements between the parties, failed to provide adequate assurances of construction financing and permitted Y/D to file a mechanic's lien against 74 Hegeman.

### 1. Adequate Assurances of Construction Financing

■ Plaintiffs first argue that their obligation to provide APC adequate assurances of construction financing did not survive the execution of the August 4 Documents. The Forbearance Agreement conditioned APC's forbearance on the provision of "evidence satisfactory to [APC] of [Plaintiffs'] having arranged financing to fund [the VA] construction by August 15, 2000." Forbearance Agreement ¶ 1.3. Contrary to Plaintiffs' assertion, the August 4 Documents did not supersede or eliminate this condition.

"[C]onstruction of contract terms is a matter of law and not a factual determination." *Ianelli v. Standish*, 156 Vt. 386, 389, 592 A.2d 901, 903 (1991). The question of whether a contract term is ambiguous or not should be decided by the Court. *Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575, 577, 556 A.2d 81, 83 (1988). The language of an unambiguous contract term "must be given effect in accordance with its plain, ordinary and popular sense." *Id.*, 150 Vt. at 579, 556 A.2d at 85.

In this case, the August 4 Documents unambiguously incorporate the parties' obligations under the Forbearance Agreement. Under Vermont law, "[i]t is . . . well established that a contract may be reached with reference to another writing, and the other document, or so much of it as is referred to, will be interpreted as a part of the main instrument." *Newton v. Smith Motors Inc.*, 122 Vt. 409, 412, 175 A.2d 514, 516 (1961). Incorporation occurs where the extrinsic writing is specifically referenced in the contract or its incorporation is implicitly contemplated by the parties to the contract at the time the contract is created. *Id.* In this case the Rider contains a provision that specifically references the Forbearance Agreement as a whole. ¶ B. The Rider also references the Forbearance Agreement when discussing Plaintiffs' request that APC forbear from enforcing the August 4 Note by "adding to the rights they have under the documents and agreements related to the Merchants Loans by . . . (ii) consenting to an extension of the limited moratorium on principal and interest set forth in the Forbearance Agreement." ¶ F. These references indicate that the parties intended that their rights and obligations under the Forbearance Agreement would continue to exist after execution of the August 4 Documents.

Moreover, paragraph 11 of the Rider explicitly discusses the issue of superseded documents. This provision states that, "except to the extent provided in the August 4 Documents," any obligations contained in the Merchants Loans and any connected notes are "replaced and superseded by" the August 4 Documents. That this provision makes no mention of superseding the Forbearance Agreement

further indicates that its conditions survived the August 4 Documents. In sum, the plain language of the Rider indicates that the parties intended that their rights under the Forbearance Agreement would be incorporated into the August 4 Documents.

Even if the Forbearance Agreement had not survived the execution of the August 4 Documents, Plaintiffs were obligated to provide the same assurances of construction financing under the 74 Hegeman mortgage securing the August 4 Note. The mortgage provides that upon request by the holder of the mortgage, Plaintiffs were required to provide adequate assurances that they "can and will pay the cost of any improvements" to the property. 74 Hegeman Mortgage at 2. Their failure to do so constitutes a default under the mortgage. *Id.* at 3. Accordingly, in addition to the Forbearance Agreement, the August 18 Notice of Default identified other "loan documents," such as the mortgage, as the basis for the construction financing default.[5] Finally, there can be no doubt that APC requested these assurances from Plaintiffs: the Forbearance Agreement set a deadline for providing the assurances, Simon requested such assurances in his August 16 email to and during an August 17 conversation with Francis von Turkovich, and Simon's attorney requested the assurances in an August 17 email. Defs. Mot. for Summary J., Exs. 4, 14, 15.

Plaintiffs next contend that adequate assurances of construction financing were provided to APC in August 2000. They do not suggest that they had provided adequate assurances of construction financing to APC by August 18 when APC sent the first default letter. Instead they point to the two loan commitment letters Plaintiffs forwarded to APC on August 20. These commitment letters cannot be said to constitute adequate assurances. Although the commitment from Citizens Bank may still have been open on the 20th, Francis von Turkovich admits that the terms of this commitment did not provide sufficient funding to cover the construction costs that had already been incurred. Moreover, the terms of the loan detailed in the commitment required the guaranty of Andrew Rickard, the von Turkoviches' partner in the Richmond Group, who was in the progress of withdrawing from the partnership at that time. The second commitment letter similarly would not have covered the costs already incurred.[6] Unlike the Citizens Bank commitment, the Chittenden Bank commitment was unsigned by the von Turkoviches and expired at the close of business on August 20. No rational juror could find these commitment letters to have constituted adequate assurances of construction financing.

This default alone was sufficient to justify the August 18 Notice of Default. It cannot, as Plaintiffs suggest, be considered immaterial. There is no dispute that the VA lease greatly increased the value of 74 Hegeman and that the VA had the right

---

**5.** The August 4 Documents specifically state that this mortgage, and the others underlying the Merchants Loans, were not superseded. Rider ¶¶ 3, 11.

**6.** Like the Citizens Bank commitment, the Chittenden Bank commitment was conditioned upon receipt of a first mortgage interest in 74 Hegeman as collateral. APC already held a mortgage on the property and the August 4 Documents included a $531,040, plus interest, release price for this mortgage. Charter One also held a $175,000 mortgage on the property. In addition, approximately $400,000 was already due Y/D for the work and additional "soft-costs" were owed to architects and others in connection with the work. Thus, the total payoff required to meet the conditions of the commitment well exceeded the $970,000 amount of the commitment.

under the lease to seek consequential damages from Plaintiffs if the fit-up work was not completed on time. Thus, the possibility that Y/D might stop work for lack of payment made assurances of financing for that work important both to APC's interest in 74 Hegeman and its goal to be "taken out" via refinancing of the August 4 Note. That APC made the assurances requirement a specific condition of its willingness to forbear indicates the importance it placed on this requirement.

After notifying Plaintiffs of their defaults, APC did not make use of any default remedies until September 1, when it filed the Foreclosure Complaint. During that time Plaintiffs failed to cure the defaults at issue.[7] Even if they continued to "diligently" attempt to obtain financing after August 18, such efforts do not change the fact that they have not come forward with any evidence to show that they provided APC with adequate assurances of such financing prior to December 2000. For this reason, the subsequent September 18 Notice of Default, the Foreclosure Complaint, and the October 6 Notice of Intent to Foreclose, which also relied on Plaintiffs' failure to provide such adequate assurances, cannot be said to be unfounded.[8]

### 2. Filing of the Mechanic's Lien

The notices of default and intent to foreclose and the Foreclosure Complaint, filed post-August 25, are further justified by the filing of the mechanic's lien by Y/D. Plaintiffs contend that this mechanic's lien did not constitute a default under the August 4 Documents. The plain language of these documents refutes this argument. The Forbearance Agreement specifically conditioned forbearance and withdrawal of APC's objections on Plaintiffs' promise "to permit no notices of mechanic's lien to be filed against the Property." Forbearance Agreement ¶ 1.3. As discussed above, the obligations of the Forbearance Agreement were incorporated in the August 4 Documents. Consistent with this obligation, in the Business Loan Agreement Plaintiffs agreed not to, without prior consent of APC, encumber any of their properties, except as allowed as a "Permitted Lien." Business Loan Agreement at 5. Permitted Liens are defined to include mechanic's liens "securing obligations which are *not yet delinquent.*" *Id.* at 2 (emphasis added).[9] In this case, there is no legitimate question that Plaintiffs' debt to Y/D for approximately $400,000 was delinquent. The notice of mechanic's lien filed by Y/D stated that payment for the $400,000 in labor and materials furnished had come due within 30 days of the filing of the notice and was still due and owing to Y/D.

APC argues that the filing of the mechanic's lien was in fact induced by the conduct of Simon, and thus cannot constitute a default. Plaintiffs base this claim on the conversation Simon admits to having with Dousevicz, Simon's testimony that Y/D was "unconcerned about any lack of

---

7. The parties dispute the existence of a cure period under the August 4 Documents. At the very least, the mortgage to 74 Hegeman permits a ten day cure period or reasonable time to cure. However, Plaintiffs failed to undertake such a cure for the bulk of the defaults during this time period.

8. Moreover, Plaintiffs do not dispute that they failed to pay the loan origination fee and interest by September 15 or that this constituted a default under the August 4 Documents. This default was identified in the September 18 Notice of Default and the October 6 Notice of Intent to Foreclose.

9. Thus, although Plaintiffs were permitted to incur debt in connection with the VA Project, they were not permitted to allow this debt to become delinquent, as when the mechanic's lien was filed.

payment, and intended to continue work on the project without filing a lien," and the fact that the mechanic's lien was filed a few days after this conversation. At issue is whether a reasonable juror could find that Simon's statements and the filing of the mechanic's lien demonstrate that APC caused this filing.

Simon states that a few days prior to the filing of the mechanic's lien, he spoke with Dousevicz and told him that

if there was any thought of stopping work because they had not been paid, I would arrange payment. But I could not do so unless there was a construction lien under the documents. I couldn't do so and recover the money unless there was a construction lien that I paid off.

I said if you're concerned about payment, if your concerns about nonpayment are of a magnitude that would result in any production of the tremendous amount of overtime or stoppage of work, I want to act as an assurety for these borrowers that haven't paid you.

Simon Dep. at 66–67. This testimony demonstrates that Simon was concerned about the impact of Plaintiffs' nonpayment on the progress of the construction work. Simon testified that his concern stemmed from the risk APC might suffer from the work stoppage, in particular, a failure to complete construction that caused the loss of the lucrative VA lease or, alternatively, completed construction that remained unpaid leading to a series of foreclosures. *Id.* at 67. These events would in turn hinder APC's ability to be "taken out," through refinancing of the August 4 Note. *Id.* There is no indication that Simon's intent was to create a default under the August 4 Documents.

Moreover, the testimony does not demonstrate that Simon was responsible for the filing of the mechanic's lien. Simon's

deposition later clarifies that he never told Dousevicz that the only way Y/D could guarantee payment was to file the mechanic's lien:

Q So you told Jim Dousevicz that the only way that you could guarantee he would be paid was if he filed a mechanic's lien; right?

A If you need me—there are lots of ways to get paid. I didn't say the only way I could guarantee it. But if he needed me to arrange payment ..., or else he would stop work, ...—the issue of payment and the mechanic's lien is secondary to the issue of the progress of the job.

*Id.* at 71–72. In addition, Simon's testimony suggests that Y/D had every motivation to file the mechanic's lien for its own benefit. At that point in the summer, Y/D had been working for nearly two months, was already owed $400,000, and had yet to be paid. Simon stated that Dousevicz sounded "really annoyed" that Francis von Turkovich had repeatedly failed to come through with promised funding. *Id.* at 70.

However, Dousevicz also told Simon that work stoppage was unlikely to occur because he felt he would be well-secured by the value of the property with the VA lease if Plaintiffs failed to come through with funding. *Id.* at 69. Plaintiffs contend this testimony demonstrates that Y/D intended to continue to work without filing a lien. At most, however, it indicates that Y/D was planning to continue to work under the belief that it would have a security interest in the property superior to APC's mortgage. It is not clear that Y/D intended this security interest to arise with or without the filing of a mechanic's lien.

In sum, this testimony indicates that Simon advised Dousevicz that he would be willing to pay to keep work going, but that he was only willing to do so if a mechanic's

lien was filed. It is clear that Y/D was not concerned about being paid if it could obtain a security interest in the property. The testimony fails to demonstrate that APC induced Y/D to file the mechanic's lien.

Plaintiffs have not met their burden of demonstrating a genuine dispute of material fact as to their default on the agreements with APC. Because Plaintiffs were in default, APC was permitted to exercise its default remedies under the August 4 Documents. Accordingly, Plaintiffs' breach of contract claim and request for declaratory judgment are denied. Similarly, their covenant of good faith and fair dealing claim, to the extent it relies on their lack of default, and their defamation claim, which relies on false statements by APC of Plaintiffs' default, are denied.

### D. Plaintiffs' Remaining Claims

The two remaining claims brought by Plaintiffs are similar to each other in basis. Plaintiffs allege that APC improperly interfered with its business relationship with one of its tenants [10] and violated the covenant of good faith and fair dealing by harassing the same tenant when exercising its rent assignment rights.[11] Plaintiffs offer the testimony of one of their tenants, Jacob Glaser ("Glaser"), to support these claims.

Glaser, a ten-year tenant of Plaintiffs, states that Simon contacted him by phone a number of times. The contacts apparently involved APC's attempt to exercise its assignment of rents rights and to object to some construction being undertaken in Glaser's space. Simon also requested copies of Glaser's balance sheets, asked what his sales were, and inquired about other tenants. Glaser found these conversations "very aggravating" because Simon was "a little threatening ... at times" and "tried to be very overbearing." Glaser Dep. at 21–22. Glaser did not feel Simon had the right to ask many of the questions, and asked Simon to stop calling. Simon continued to call, however. These conversations caused Glaser to feel "very uncertain about the status of our landlord's business." *Id.* at 23. Glaser had previously heard rumors from other people that the von Turkoviches were in a "bad situation" financially, but he states that Simon's calls greatly increased this concern. *Id.* at 23, 25.

After Simon's contacts, Glaser began to look for new office space even though his lease extended until November 2001. In November 2001, more than a year after the conversations with Simon, Glaser did not exercise his option to renew the lease for another year. Instead, as indicated in

---

**10.** Plaintiffs attempt to reserve the right to "address" similar claims involving other tenants, but have provided no evidence to support these claims. Pls.' Opp'n to Mot. for Summ. J. at 8 n. 4. Apparently they intend to come forward with evidence of harassment of these tenants in the future. Such intentions, even if good, are not sufficient at the summary judgment stage. Plaintiffs had an obligation to come forward with these facts in their opposition to summary judgment and APC's motion is therefore granted with regard to claims against any other tenant.

**11.** Plaintiffs' complaint provides myriad additional bases for these claims, including falsely representing to Plaintiffs' tenants that the United States Attorney's office was investigating Plaintiffs, impersonating a federal census worker to obtain information about tenants' business relations with Plaintiffs, and communicating false and derogatory information about Plaintiffs to Plaintiffs' tenants and a lender with whom Plaintiffs were negotiating. V. Compl. ¶¶ 72, 76. However, Plaintiffs have failed to come forward with any admissible evidence to support these allegations. Because Plaintiffs have not met their burden under Rule 56, the Court will enter judgment for APC on these claims.

his January 2002 deposition, Glaser's company had purchased new office space and was to move out of 74 Hegeman in February 2002. Glaser states that the move was prompted in part by a need for more space, which the new offices provided. He also states that although he would have been happy to continue in a long-term lease, with sufficient space, "we wanted to have some stability in our business, and we didn't feel that the landlord offered that to us .... And we felt that it was best to, ..., leave that relationship." *Id.* at 21.

■ To prevail on their claim for tortious interference with business relations, Plaintiffs must demonstrate that APC "intentionally or improperly interfere[d] with the performance of a contract between [Plaintiffs] and [Glaser] by inducing or otherwise causing [Glaser] not to perform." *Foster & Gridley v. Winner,* 169 Vt. 621, 624, 740 A.2d 1283, 1287 (1999) (entry order) (citing *Williams v. Chittenden Trust Co.,* 145 Vt. 76, 80, 484 A.2d 911, 913–14 (1984)). Plaintiffs must also show that they had a business relationship with Glaser and that APC knew of this relationship. *Williams,* 145 Vt. at 81, 484 A.2d at 914. Finally, Plaintiffs must have suffered harm as a result of Glaser's failure to perform under the contract. *Id.,* 145 Vt. at 81, 484 A.2d at 913.

■ In this case there is no question that Plaintiffs had a contract with Glaser and that APC was aware of this contract. It is also clear that Plaintiffs have met their burden of showing that APC's actions were improper. Whether conduct is improper is determined by considering various factors, including the nature of the actor's conduct, the actor's motive, and the relations between and respective interests of the parties. *Gifford v. Sun Data, Inc.,* 165 Vt. 611, 612 & n. 1, 686 A.2d 472, 474

& n. 1 (1996). Repeated aggressive and harassing contacts with Plaintiffs' tenant, especially those not related to the assignment of rents, are not an appropriate default remedy under the August 4 Documents. *Cf. Vescio v. Merchs. Bank,* 272 B.R. 413, 444 (D.Vt.2001) (lender's exercise of assignment of rents in accordance with that agreement did not involve any improper conduct); *Howard Opera House,* 166 F.Supp.2d at 930–31 (tenant's complaints to landlord of noise from another tenant, without more, not wrongful or improper).

A rational jury could also find that Simon's conduct was intentional. The element of intent requires, at least, that APC "kn[e]w[ ] that interference was substantially certain to occur as a result of [its] action." *Williams,* 145 Vt. at 81, 484 A.2d at 914; *accord Gifford,* 165 Vt. at 612, 686 A.2d at 473–74. In this case it is reasonable to conclude that, even if Simon did not act with the desire of interfering with the lease, he knew that his aggressive conduct—despite Glaser's requests that he stop calling—was substantially certain to cause such interference. It is also reasonable to conclude that Simon's conduct caused Glaser not to renew the lease. *See Gifford,* 165 Vt. at 612, 686 A.2d at 474 ("The jury may find inducement if the defendant's acts caused the nonperformance of the contract."). Glaser's testimony indicates that he was willing to remain in leased space and did not actively seek new space until after Simon's phone calls. His testimony also indicates that his move was prompted by his concerns that Plaintiffs did not provide his business the stability it needed. It can be reasonably inferred from this testimony that Simon's harassing and aggressive conduct created this concern [12] and prompted him to look for new space and ultimately leave 74

**12.** The Court recognizes that this is a close question as it may also be reasonably con-

Hegeman. Finally, Plaintiffs have set forth sufficient facts to demonstrate that the loss of a lease at 74 Hegeman harmed them.

■ APC is also not entitled to summary judgment on Plaintiffs' implied covenant of good faith and fair dealing claim. Under this implied covenant, "each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement" between them. *Carmichael v. Adirondack Bottled Gas Corp. of Vt.*, 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993). The implied covenant "exists to ensure that parties to a contract act with faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Id.* (quotations omitted). Whether a party has exercised good faith under a contract is "a concept that varies ... with the context in which it is deemed an implied obligation." *Id.* (quotations omitted). However, bad faith conduct is "characterized as violating 'community standards of decency, fairness or reasonableness.'" *Southface Condo. Owners Ass'n v. Southface Condo. Ass'n, Inc.*, 169 Vt. 243, 246, 733 A.2d 55, 58 (1999) (quoting *Carmichael*, 161 Vt. at 209, 635 A.2d at 1216).

■ At issue is whether APC "adhered to the agreed common purpose of the contract consistent with the justified expectations of" Plaintiffs and whether Simon's actions constituted bad faith conduct. *Southface*, 169 Vt. at 246, 733 A.2d at 58. Plaintiffs have provided evidence of conduct by APC that went beyond the terms of this agreement. *See id.* (party asserting breach of the implied covenant must demonstrate that the other party "acted beyond merely observing the terms of the loan agreement"); *cf. Vescio*, 272 B.R. at 441–42 (acts expressly authorized under

an agreement did not constitute bad faith). A reasonable juror could find that this conduct did not conform with Plaintiffs' justified expectations under the August 4 Documents. Whether such behavior was violative of "community standards of decency, fairness or reasonableness" is a closer question. That Simon's conduct may have been improper under the contract does not necessarily mean it was undertaken in bad faith. However, such a question is "ordinarily a question of fact, one particularly well-suited for juries to decide." *Carmichael*, 161 Vt. at 209, 635 A.2d at 1217. In this case, jury determination is necessary to decide this issue. Accordingly, summary judgment is not appropriate.

## IV. Conclusion

Wherefore APC's motion for summary judgment (paper 47) is **GRANTED** as to Counts I, III, VI, VII, VIII, and **DENIED** as to Counts IV and V.

---

cluded from Glaser's testimony that the fact of Plaintiffs' financial problems, properly relayed to him through APC's foreclosure at-

tempt and exercise of its assignment of rents rights, alone, may have prompted him to look for new space.