Choiniere v. Marshall, No. 10-1-05 Wrcv (Eaton, J., Mar. 19, 2013)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

# STATE OF VERMONT

SUPERIOR COURT
Windsor Unit

CIVIL DIVISION
Docket No. 10-1-05 Wrcv

Paul Choiniere and P&D Consulting, Inc.
      Plaintiffs

v.

Anthony Marshall and Harris Beach PLLC
      Defendants

### Decision on Defendants' Motion for Summary Judgment

At issue is whether plaintiffs Paul Choiniere and P&D Consulting, Inc., have demonstrated a genuine issue for trial on their claims for negligent misrepresentation and fraud in the inducement. Defendants Anthony Marshall, Esq., and Harris Beach PLLC contend that plaintiffs have failed to show sufficient evidence that Attorney Marshall made any false statements upon which plaintiffs justifiably relied. *Celotex v. Catrett Corp.*, 477 U.S. 317, 322 (1986); *Poplaski v. Lamphere*, 152 Vt. 251, 254–55 (1989). Defendants also seek a ruling on their asserted defense of lack of personal jurisdiction.

The following facts are established by the record and set forth in the light most favorable to plaintiffs. Mr. Choiniere and his wife owned an automobile dealership and a marine dealership in South Burlington for many years. Over time, they came to know the Button family—Christine Rowe-Button, her husband Henry Button, and her stepson Andrew Button— through the Button family's ownership of a private charter service that operated out of the Burlington airport.

Between 2000 and 2003, Henry Button and Andrew Button engaged in a number of other business ventures, including the purchase of the marine dealership from the Choinieres. During this time, Henry Button made cash advances to the family businesses, and the businesses also took out a number of loans that were secured by personal guarantees given by Henry Button and Christine Rowe-Button.

In September 2003, Henry Button and Andrew Button purchased an automobile dealership in Claremont, New Hampshire, and moved it to a more prominent location in White River Junction. Henry Button and Andrew Button borrowed money from the bank and also borrowed $1 million dollars from Mr. Choiniere. Mr. Choiniere's loan was secured by personal guarantees given by Henry Button and Christine Rowe-Button. After this deal was completed, Andrew Button began negotiating with Mr. Choiniere for an additional loan of $1.3 million for the acquisition of two more automobile dealerships in Keene, New Hampshire.

In January 2004, Henry Button committed suicide. Christine Rowe-Button hired Anthony Marshall, Esq., to assist in settling her late husband's estate. She wanted to divest the estate from its dealings with the family businesses. She also asserted that her signature on the personal guarantees had been forged.

Attorney Marshall began negotiating with Andrew Button's attorneys in the hopes of obtaining a release of the personal guarantees. After several months, however, the negotiations stalled. Attorney Marshall decided to "ignite" the negotiations by sending a letter to Andrew Button's creditors telling them that: (1) Christine Rowe-Button would be terminating the guarantees with respect to future advances; and (2) she had a claim for forgery with respect to the existing guarantees. He felt that such a letter would cause the creditors to pressure Andrew Button into providing them with different security for their loans, and thus facilitate the release of the personal guarantees. He therefore arranged for Christine Rowe-Button to send the following letter to each of the creditors who held personal guarantees from her and the estate:

April 8, 2004

Re: **TERMINATION OF GUARANTY**

Dear Mr. Choiniere:

I am the surviving spouse of Henry O. Button II, who died on January 3, 2004. Henry O. Button II (during his life, and now the Estate of Henry O. Button II) (the "Estate") executed a Personal Guaranty in your favor. There may also be a Personal Guaranty purportedly executed by me in your favor, but which may not reflect my actual signature thereon (all and any such documents from the Estate or me referred to as the "Guaranty"). By the Guaranty, the Estate agreed, and purportedly I agreed, to personally guarantee the payment and performance of all indebtedness owing to you (and specifically that certain loan in the original principal amount of $1,000,000.00 to Button Holdings Real Estate, LLC), whether existing at the time of the execution of the Guaranty or thereafter arising.

**PLEASE TAKE NOTICE THAT EFFECTIVE AS OF THE DATE OF THIS LETTER, THE ESTATE AND I HEREBY TERMINATE ALL AND ANY GUARANTIES EXECUTED OR PROVIDED, OR PURPORTEDLY EXECUTED AND PROVIDED, TO YOU OR YOUR ASSIGNS WITH RESPECT TO ALL AND ANY INDEBTEDNESS OWING TO YOU BY BUTTON HOLDINGS REAL ESTATE, LLC OR ANY AFFILIATE OR OTHER ENTITY, WHETHER EXISTING AT THE TIME OF THE EXECUTION OF THE GUARANTY OR THEREAFTER ARISING.**

2

If you have any questions, please do not hesitate to contact me.

Very truly yours,
/s/
Christine Rowe-Button, M.D., individually and as Executrix of the
Estate of Henry O. Button II.

The parties dispute the meaning of the letter, but the dispute is not material to the outcome of the case. An obvious interpretation of the letter, and the one most favorable to plaintiffs, is that the letter was meant in part to suggest that the existing guarantees may be void because of the claim of forgery.

As for the other purpose of the letter, the parties have disputed what was meant by the word "terminate." The dispute is not material to the outcome of the case, but for the record, a "termination" is a term of art in the context of guarantees: it refers to the right of a continuing guarantor to "terminate" a guarantee as to future advances that are extended after the "termination notice" is received by the obligee. *O'Brien Bros. Partnership v. Plociennik*, 2007 VT 105, ¶ 13, 182 Vt. 409; *Ricketson v. Lizotte*, 90 Vt. 386, 390 (1916); 23 Williston on Contracts § 61:45 (4th ed.). A guarantee cannot be "terminated" as to the debt that has already been extended in reliance upon the guarantee, however, because a guarantee is irrevocable as to existing debt. As such, the April 8th letter was entirely ineffective to the extent that it purported to "terminate" the existing debt.[1] *Ricketson*, 90 Vt. at 390.

Attorney Marshall clarified this point in his next letter, sent about a week later:

April 14, 2004.

Re: **Termination of Bank Guaranty**

Dear Mr. Choiniere:

Please be advised we represent Christine Rowe-Button, individually and as Executrix of the Estate of Henry O. Button II. Enclosed please find a Termination of Guaranty executed by Dr. Button in her individual and fiduciary capacities. While the Guarantors may have some irrevocable obligations pursuant to the terms of the September 2003 Guaranty Agreement, the purpose of this termination notice is to confirm that the Guaranty shall not

---

[1] Plaintiffs contend that it does not make sense to apply the term-of-art meaning to their termination notice because their guarantee was not a continuing one. In making this argument, however, plaintiffs have not acknowledged the undisputed fact that nearly-identical letters were sent to other creditors, some of whom held continuing guarantees (or at least Christine Rowe-Button was concerned that the guarantees might otherwise be construed as securing future advances). Even aside from that, there is nothing nonsensical about a guarantor choosing to make clear that she has no future obligations under a guarantee. And even aside from that, the dispute over the meaning of the word "terminate" is immaterial because it is obvious that the letter meant to imply that the guarantee might be void on forgery grounds, e.g., *Terrill v. Tillison*, 75 Vt. 193, 196 (1903).

3

extend to any new advances or new indebtedness created after actual receipt by you of this Termination.

Please do not hesitate to contact me, should you have any questions.

Very truly yours,
/s/
Anthony P. Marshall, Esq.

Douglas Riley, Esq., represented Mr. Choiniere at the time. Attorney Riley read the letters and advised Mr. Choiniere to call the 2003 loan and not to make any additional loans to Andrew Button unless both the April 8th and April 14th letters were retracted and new assurances were made. Attorney Riley then asked Andrew Button's attorney to obtain "a retraction or other firm, written assurances from Christine Rowe-Button that the Guaranties were still in place, that they still guaranteed the September 2003 loan (in whatever amount is currently still due) and that she no longer claimed that her signature was forged."

Mark Sperry, Esq., represented Andrew Button at the time. Attorney Sperry wrote to Christine Rowe-Button and Attorney Marshall on April 27th with the following demand:

> We also need to address the letters written to Bombardier and Choiniere respecting termination of the guarantees. As I indicated in our conversation, we need immediate letters signed by the Estate and Christine to each of these creditors revoking those letters and stating that the guarantees remain in force in accordance with their terms. Otherwise, I am doubtful of reaching any accommodation respecting these guarantees. Also, Bombardier has frozen the boat line of credit at a critical time in the boat selling season and Choiniere's attorneys are advising him to call in his loan. TIME IS OF THE ESSENCE ON THIS MATTER.

Attorney Marshall responded on behalf of Christine Rowe-Button with the following letter, which he sent the next day, April 28th. He addressed the letter to one of Mr. Choiniere's attorneys:

April 28, 2004

Re: **RESCISSION OF TERMINATION OF GUARANTEE**

Dear Mr. Webster:

We are attorneys for the Estate of Henry O. Button II and Christine Rowe-Button, the surviving spouse of Henry O. Button II and the executor of the estate. Your client received a letter from our client dated April 8, 2004 advising him that any guarantee as was

4

provided by our clients respecting Button Holdings Real Estate, LLC debt to Paul H. Choiniere was terminated (the "Termination Notice"). We have been authorized by our clients to deliver this letter to you.

**BE ADVISED THAT THE TERMINATION NOTICE IS HEREBY REVOKED AND RESCINDED.**

If you have any questions, please do not hesitate to contact me.

Very truly yours,
Harris Beach LLP
/s/
Anthony P. Marshall

Plaintiffs claim that Christine Rowe-Button "acquiesced" in this letter to the demands made by the attorneys representing Mr. Choiniere and Andrew Button.[2] Plaintiffs contend that they therefore relied on the letter as a promise from Christine Rowe-Button that she "would honor her guarantee."[3]

At the heart of the case is whether the April 28th letter actually made any such promises.

*Issue #1: Personal Jurisdiction*

Before turning to the merits, defendants have argued that the court lacks personal jurisdiction over them. Here, the relevant procedural history is as follows. Andrew Button commenced the present action in January 2005. He sought a declaration that Christine Rowe-Button had signed the guarantees and that her signature was not forged. Mr. Choiniere then intervened and added a claim against Christine Rowe-Button for breach of the personal guarantee. He argued that she was estopped from asserting that her signature was forged because she had promised in her April 28th letter that she would honor her guarantee. Christine Rowe-Button responded by arguing that she had not authorized Attorney Marshall to send the April 28th letter.

Mr. Choiniere thereafter amended the complaint in December 2008 to add claims against Attorney Marshall and Harris Beach PLLC for breach of the implied warranty of authority. Attorney Marshall and Harris Beach answered the complaint in April 2009. Among their affirmative defenses, they listed "lack of personal jurisdiction," but they did not seek a ruling on the issue under Vermont Civil Procedure Rule 12(b). Instead, Attorney Marshall and Harris Beach spent the next two years engaging in discovery relative to the merits of plaintiffs' claims, including by obtaining court rulings on discovery matters.

---

[2] Plaintiff's Memorandum in Support of their Objections to Anthony P. Marshall and Harris Beach's Pre-Trial Motions at 8 (filed Jan. 22, 2013).

[3] Id. at 10–11; Plaintiff's Fourth Amended Complaint, ¶ 25 (filed June 20, 2011).

5

Mr. Choiniere eventually settled his claims against Christine Rowe-Button. He also settled a claim against Attorney Riley and Attorney Riley's law firm for their handling of this matter. He then amended the complaint (the fourth amended complaint) in June 2011 to assert claims against Attorney Marshall and Harris Beach for fraud in the inducement, negligent misrepresentation, and equitable estoppel.

Attorney Marshall and Harris Beach opposed the motion to amend the complaint. They then filed a Rule 12(b)(6) motion to dismiss the complaint for failure to state a claim upon which relief could be granted, and were successful in obtaining the dismissal of the count for equitable estoppel. They then filed a motion for reconsideration in December 2011, and were successful in obtaining further incremental relief on the merits. No mention of personal jurisdiction was made in either motion.

Attorney Marshall and Harris Beach filed an answer in January 2012 in which they again listed the affirmative defense of personal jurisdiction. Attorney Marshall and Harris Beach then filed a joint motion with plaintiffs in March 2012 representing that more time was needed to take depositions and "accomplish further discovery in preparation for trial." It was not until December 2012—43 months after they first appeared in this action—that Attorney Marshall and Harris Beach first sought a ruling on the question of whether the court lacked personal jurisdiction over them.

By any measure, defendants waited too long to raise the issue. It is true that due process requires that all defendants be "subject to the personal jurisdiction of the court," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980), but it is also well-settled that this principle of due process is "satisfied when a defendant attempts to make an appearance . . . and tries to litigate the merits of the claim." *Yanmar American Corp. v. Crean Equip. Co.*, 2012 VT 35, ¶ 8. "As a general matter, personal jurisdiction may be acquired by a litigant's appearance or participation in the lawsuit. Moreover, objections to personal jurisdiction are waived if not timely asserted by motion or in the answer." *Id*. (quotation omitted); see also V.R.C.P. 12(h)(1) (explaining that a defense of lack of personal jurisdiction is waived if omitted from a pre-answer motion to dismiss). Here, defendants litigated the case for three years before raising the issue; in addition, they filed a pre-answer motion to dismiss the fourth amended complaint that raised substantive issues but which did not raise any defense based upon personal jurisdiction. By doing so, defendants waived the defense. V.R.C.P. 12(h)(1); *Yanmar American Corp.*, 2012 VT 38, ¶ 9.

Even if there was no technical waiver, defendants forfeited the defense by failing "to assert it seasonably." *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 62 (2d Cir. 1999) (quoting *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168 (1939)). Defendants participated in the case for three and a half years before making any substantial attempt to assert that they were not subject to the personal jurisdiction of the court. During that time, defendants engaged in extensive and protracted discovery disputes, obtained court rulings on discovery disputes, and obtained rulings on the merits. Defendants also represented to the court at various times that they would be ready for jury draw soon. By any measure, defendants' conduct in this lawsuit brings them within the scope of those cases that have found that extensive participation

in litigation can result in the forfeiture of the defense of lack of personal jurisdiction, e.g., *Hamilton*, 197 F.3d at 62; *Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1297 (7th Cir. 1993).

Defendants have argued that they did not waive or forfeit the defense because they only recently completed discovery on the issue. Such an argument elides the point: that defendants actively engaged the merits of the case for 43 months before seeking to dismiss the case on the basis of a lack of personal jurisdiction. The waiver and forfeiture rules are meant to force the issue of personal jurisdiction into the open rather than allowing it to remain in the shadows until the eve of jury draw. On the facts of this case, the court finds the waiver and forfeiture rules to be appropriately applied.

*Issue #2: No False Promises Were Made*

At issue on the merits is whether the April 28th letter contained any false promises.

Plaintiffs' claim is that the letter contains the false promise that Christine Rowe-Button would honor her guarantee.[4] Of course, the letter does not expressly include those words. Plaintiffs' theory is that such a meaning can be inferred because the April 28th letter "acquiesced to" or otherwise accepted the demands that were made by Attorney Sperry and Attorney Riley.[5]

Any interpretation of the April 28th letter based upon a theory of acceptance, however, would require proof that the April 28th letter matched the terms of the demands that were made. See *Starr Farm Beach Campwoners' Ass'n, Inc. v. Boylan*, 174 Vt. 503, 505 (2002) (mem.) (explaining that "[an] acceptance, to conclude the agreement, must in every respect meet and correspond with the offer, neither falling short of nor going beyond the terms proposed, but exactly meeting them at all points") (quotation omitted). Here, a review of the relevant letters shows that the April 28th response did <u>not</u> match the terms of the requests that were made by Attorney Sperry and Attorney Riley.

As a starting point, after Attorney Riley received the letters of April 8th and April 14th, he told Attorney Sperry that his client would require "firm written assurances from Christine Rowe-Button that the Guaranties were still in place, that they still guaranteed the September 2003 loan (in whatever amount is currently still due) and that she no longer claimed that her signature was forged."

Attorney Sperry then wrote a letter to Attorney Marshall in which he demanded that Attorney Marshall provide "immediate letters signed by the Estate and Christine to each of these creditors revoking those letters and stating that the guarantees remain in force in accordance with their terms."

---

[4] Plaintiff's Fourth Amended Complaint, ¶ 25 (filed June 20, 2011).

[5] Plaintiff's Memorandum in Support of their Objections to Anthony P. Marshall and Harris Beach's Pre-Trial Motions at 8 (filed Jan. 22, 2013)

Attorney Marshall then responded to the demand as follows:

April 28, 2004

Re: **RESCISSION OF TERMINATION OF GUARANTEE**

Dear Mr. Webster:

We are attorneys for the Estate of Henry O. Button II and Christine Rowe-Button, the surviving spouse of Henry O. Button II and the executor of the estate. Your client received a letter from our client dated April 8, 2004 advising him that any guarantee as was provided by our clients respecting Button Holdings Real Estate, LLC debt to Paul H. Choiniere was terminated (the "Termination Notice"). We have been authorized by our clients to deliver this letter to you.

**BE ADVISED THAT THE TERMINATION NOTICE IS HEREBY REVOKED AND RESCINDED.**

If you have any questions, please do not hesitate to contact me.

Very truly yours,
Harris Beach LLP
/s/
Anthony P. Marshall

In other words, while the April 28th letter did agree to rescind the April 8th letter, it did not match the terms of any of the other demands:

1. It did not retract the April 14th letter, in which Attorney Marshall said guardedly that his client "may" have incurred obligations under the guarantee, and in which the guarantee was terminated as to any future advances.

2. It did not make any promises or assurances of any kind.

3. It was not signed by Christine Rowe-Button in her individual capacity.

4. It was not signed by Christine Rowe-Button in her capacity as administrator of the estate.

5. It did not say that the guarantees were still in place.

8

6.  It did not say that Christine Rowe-Button still guaranteed the September 2003 loan.

7.  It did not say that Christine Rowe-Button no longer claimed that her signature was forged.

8.  It did not say that "the guarantees remain[] in force in accordance with their terms."

In other words, the April 28th letter is non-responsive to almost all of the demands that were made upon Attorney Marshall. As a matter of law, therefore, it cannot be construed as an acceptance of the demands that were made by Attorney Sperry. "[A]n acceptance, to conclude an agreement, must in every respect meet and correspond with the offer, neither falling short of nor going beyond the terms proposed, but exactly meeting them at all points . . . and, in the absence of such an acceptance, subsequent words or acts of the parties cannot create a contract." *Boylan*, 174 Vt. at 505 (quotation omitted); accord *Noble v. Kalanges*, 2005 VT 101, ¶ 28, 179 Vt. 1; *Ackerman v. Carpenter*, 113 Vt. 77, 81 (1943). It was a rejection of the proposed terms rather than an acceptance of them.

Plaintiffs have also argued that the April 28th letter, standing alone, can be reasonably interpreted to mean that Christine Rowe-Button was rescinding all of her claims that she would not honor her guarantee, "thereby leading to the only reasonable inference that she would honor her guarantee." The problem with this interpretation is that the April 28th letter does not stand alone: it must be read in the context of the ongoing negotiations between the parties. See *Ackerman*, 113 Vt. at 81 (explaining that "[i]n determining what one party intended and the other ought to have understood, regard must be had to the situation and purpose of the parties, the subject matter and course of the negotiations"). As above, therefore, plaintiffs' interpretation is unreasonable because it attempts to read into the April 28th letter the very assurance that Attorney Marshall declined to provide.

Plaintiffs have also suggested that the court needs to resolve the question of what the April 28th letter actually meant, with the resulting implication being that the interpretation of the April 28th letter is a factual question for the jury. However, the issue in the pending motion for summary judgment is not what the letter meant, but rather whether plaintiffs have adduced sufficient evidence to persuade a reasonable jury that the letter contained the alleged false promise. *Estate of Alden v. Dee*, 2011 VT 64, ¶ 16, 190 Vt. 401. Plaintiffs attempted to prove this essential element by reading their own words into the letter, but failed to adduce any evidence that defendants ever accepted or endorsed those words. As such, the only question for the court is whether plaintiffs have shown sufficient evidence to prevail at trial on each element of their claim: the answer is no.

Plaintiffs have also argued in the alternative that Attorney Marshall made a different false statement: that he was authorized to send the April 28th letter. Even assuming *arguendo* that the statement was false, plaintiffs have not explained how it was in any way material to the transaction or how the statement meets any of the other elements of intentional or negligent

9

misrepresentation. *Lewis v.Cohen*, 157 Vt. 564, 568 (1991); *Hedges v. Durrance*, 2003 VT 63, ¶ 10, 175 Vt. 588 (mem.). Plaintiffs have not established the existence of a genuine issue for trial.

*Issue #3: Plaintiffs Did Not Justifiably Rely Upon the April 28th Letter*

As an independent basis for summary judgment, plaintiffs have also failed to show that any reliance upon the April 28th letter was justifiable. *Durrance*, 2003 VT 63, ¶ 11. There are least three reasons why any purported reliance upon the April 28th letter was not justifiable as a matter of law. Cf. 2 Dobbs, The Law of Torts § 474, at 1360–61 (2001) (explaining that the justified reliance requirement may be viewed as an indirect way of assessing objectively whether the plaintiff actually relied upon the statement).

First, Mr. Choiniere's own attorney advised him not to make any more loans "unless the retractions and new assurances are made." By this, the attorney meant they needed assurances "from Christine Rowe-Button" that she would honor the guarantees and that "she no longer claimed that her signature was forged." As discussed above, none of these assurances were provided. If plaintiff wanted to rely upon an assurance in his business dealings, he should have insisted upon receiving one.

Second, Mr. Choiniere testified at his deposition that he relied upon the legal advice of his attorneys. It is true that there has been substantial dispute about what legal advice he received from Attorney Riley with respect to the interpretation of the April 28th letter. But there is no conflicting evidence about what Attorney Riley thought to himself when he received the letter: he thought it was ambiguous, "less than perfectly clear," and not "all we wanted." If there were subsequent miscommunications between Attorney Riley and Mr. Choiniere about how to respond to the letters, those miscommunications are more properly attributed to the attorney-client relationship (e.g., the concluded malpractice litigation) than to Attorney Marshall on a theory of misrepresentation.

Finally, Attorney Marshall expressly invited plaintiffs to contact him if they had any questions about the meaning of the April 28th letter. Neither Mr. Choiniere nor Attorney Riley ever did so. Having failed to seek clarification as to the meaning of the letters, it was not justifiable for plaintiffs to rely upon their own assumption about what the letter meant. *Durrance*, 2003 VT 63, ¶¶ 3, 10; *Sugarline Assocs. v. Alpen Assocs.*, 155 Vt. 437, 445 (1990).

*Issue #4: Mr. Choiniere's Claim for Damages is Speculative*

As a final independent basis for summary judgment on the claim for the non-calling of the September 2003 note, Mr. Choiniere has failed to adduce more than speculative evidence of his damages deriving therefrom. "Failure to prove damages is fatal to a claim for breach of contract, as well as for fraud." *Smith v. Country Village Int'l, Inc.*, 2007 VT 132, ¶ 10, 183 Vt. 535 (mem.). Here, Mr. Choiniere has claimed that Andrew Button would have paid the entire amount of the note if it had been called in May 2004. His evidence of this is that: (1) "Andrew Button or a Button family business" paid $76,000 towards the purchase of a Porsche automobile

in May 2004; (2) Button Holdings, LLC paid $200,000 towards the purchase price of the marine dealership in January 2004; and (3) "Andrew Button and/or a Button business organization" paid $30,000 towards the lease of a Saab automobile in April 2003.[6] From this, Mr. Choiniere invites the jury to conclude that Andrew Button and/or Button Holdings Real Estate, LLC had sufficient funds in May 2004 to repay the entire September 2003 note. A jury could only speculate to reach that conclusion; such evidence is not sufficient to support a claim for damages. See *Fayette v. Ford Motor Credit Co.*, 129 Vt. 505, 517 (1971) (ruling that collection of unsecured debt was uncertain and speculative).

*Conclusion*

In this case, plaintiffs have sought to establish a claim of misrepresentation based upon the allegation that an attorney made a false promise on behalf of his client. But in establishing the existence of that promise, plaintiffs have relied upon their own words rather than the words that were used by defendants. In the end, therefore, plaintiffs have attempted to prove their claims on the basis of what they wanted the April 28th letter to say rather than what it actually said.

**ORDER**

Defendants' Motion for Summary Judgment on Merits and Damages (MPR #52), filed December 3, 2012, is ***granted***. Defendants' Motion for Summary Judgment—Personal Jurisdiction (MPR #53), filed December 3, 2012, is ***denied***. All remaining motions are ***denied as moot***. A final judgment order will be entered separately.

Dated at Woodstock, Vermont this _____ day of March, 2013.

_____
Harold E. Eaton, Jr.
Superior Court Judge

---

[6] Plaintiff's Statement of Material Facts ¶ 95, at 25 (filed Jan. 22, 2013).